CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAY 22 2019

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

ALICE PERDUE, )
)
    Plaintiff, ) Civil Action No. 7:18CV00416
)
v. ) **MEMORANDUM OPINION**
)
ROCKYDALE QUARRIES CORPORATION, ) By: Hon. Glen E. Conrad
) Senior United States District Judge
    Defendant. )

Alice Perdue filed this action against her former employer, Rockydale Quarries Corporation ("Rockydale"), asserting claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Equal Pay Act of 1963 ("Equal Pay Act" or "EPA"), and Virginia law. The case is presently before the court on the defendant's motion to dismiss. For the reasons set forth below, the motion will be granted in part and denied in part.

## Background

The following facts are taken from the complaint and employment documents referenced therein. See Phillips v. LCI Int'l, Inc., 190 F.3d 609, 618 (4th Cir. 1999) (noting that the court could properly consider a document submitted by the defendant in determining whether to dismiss the complaint "because it was integral to and explicitly relied on in the complaint").

On June 27, 2014, Perdue accepted a supervisory position with Rockydale. Offer Letter, Dkt. No. 10-2, at 1.[1] Perdue initially requested an annual salary of $65,000. Compl. ¶ 9, Dkt. No. 1. However, the plaintiff ultimately agreed to accept a lower salary. See Offer Letter at 1 ("For this position, your starting compensation will be $923.08 per week, which is equivalent to an annual amount of $48,000."); Id. at 2 ("I agree to the terms of the employment set forth above.").

---

[1] The offer letter refers to the position as "Dispatch Supervisor." Offer Letter at 1. The complaint refers to the position as "Scale House Supervisor." Compl. ¶ 5, Dkt. No. 1.

Perdue alleges that she only did so because Gary Hubbard, who signed the offer letter on behalf of Rockydale, "promise[d] that if she proved herself, her salary would increase to $65,000 within six months." Compl. ¶ 9.

Perdue's benefits package also included use of a company vehicle. Specifically, Rockydale agreed to provide a company vehicle for Perdue to use for "business travel only." Offer Letter at 1. The defendant also agreed to cover the company vehicle's gas, maintenance, and insurance. Id.

Perdue's first day of work was July 2, 2014. Compl. ¶ 7. That same day, Perdue acknowledged receiving a copy of Rockydale's employee handbook. Receipt for Employee Handbook, Dkt. No. 14-1. The handbook provided that "[a]ll pay increases for employees shall be in writing." Employee Handbook, Dkt. No. 14-1, at 14.

Perdue subsequently learned that her predecessor, Cooper Maxey, "had use of a company truck for business travel and his work commute. Compl. ¶ 8 (emphasis added). The same was true for other male supervisors. Id. ¶ 10. However, "Rockydale never provided [Perdue] with the full use of a company truck." Id.

In addition to this alleged disparity, Perdue claims that she was subjected to "continuous sexual harassment" while working for Rockydale, and that such harassment included "name calling, swearing, angry outbursts, yelling, belittlement, crude statements, and gestures." Id. ¶ 11. For instance, Blue Hill, a scale operator at Rockydale's Jacks Mountain location, "regularly called Perdue an asshole, idiot, and bitch," and "informed Perdue that Rockydale should never have hired a 'girl' to do 'a man's job.'" Id. ¶ 13. When Perdue reported her coworker's behavior to Hubbard, he simply "laughed and said, 'Well, Blue is Blue." Id.

According to the complaint, Hill was not the only employee who engaged in rude or offensive behavior. "Male truck drivers swore at Perdue and threw tickets at her." Id. ¶ 14.

2

Additionally, Charlie Underwood, a loader driver, "regularly called Perdue names and taunted other male drivers who were professional with her." Id. ¶ 15. "His taunts were crude and sexual in nature and made over radio channels that were audible to numerous employees and drivers." Id. After learning that Perdue had complained about his behavior to the general manager, Mike Chopski, Underwood confronted Perdue and swore at her for reporting him. Id. ¶¶ 15–16.

In early June 2016, Hill attempted to have Perdue fired by arranging for a Rockydale driver to falsely claim that Perdue was sexually harassing the driver. Id. ¶ 17. Although Rockydale learned during a subsequent investigation that the allegation of harassment was "Hill's fabrication," Hill retained his position and continued to harass the plaintiff, "calling her names such as 'bitch,' 'stupid,' and 'idiot' whenever he spoke to her." Id. Although Perdue reported Hill's conduct to her supervisor, Rockydale did not take "sufficient action" to stop it. Id.

In August of 2016, "Perdue asked her supervisor, Chris Willis, about the raise she still had not received and about the company truck." Id. ¶ 18. Perdue alleges that "Willis promised the raise and the truck, but neither ever happened, despite Perdue following up with Willis several times." Id.

In May of 2017, Perdue complained to Chopski about comments made by a male driver. Id. ¶ 20. Chopski shared Perdue's complaint with the offending employee, which caused further problems. Id. Perdue alleges that employees and contract drivers began referring to her as a "'rat bitch,'" and that Hill threatened to "get her." Id. ¶¶ 20, 21. Efforts to report the behavior proved ineffective. John Basham, another supervisor, called her "stupid and dumb" when she complained about the male drivers, and "harassed Perdue for reporting improper practices to management." Id. ¶ 23.

Perdue received positive performance reviews during her employment. Her June 27, 2017 evaluation included a score of 4.15 on a scale of 5, which signified that her work "almost

3

always exceeds expectations." Id. ¶ 25. The evaluation also listed multiple "Employee Strengths." Id. (internal quotation marks omitted).

In September of 2017, the plaintiff's husband, G.R. Perdue ("G.R."), began working for Kenneth Foley, a company that picked up loads of materials from Rockydale. Id. ¶ 27. G.R. had previously worked for another hauler in the same capacity. Id. ¶ 26. Management officials at Rockydale were aware of both of these jobs held by G.R., and they "never expressed any concern, or indicated that it was a 'potential conflict of interest' for Perdue's husband to work for a company that was picking up loads from Rockydale." Id. ¶ 26. Nonetheless, on October 3, 2017, Willis advised Perdue that G.R.'s employment with Foley was a potential conflict of interest that should have been reported to management. Id. ¶ 32.

When Perdue returned to work on October 11, 2017, Rockydale terminated her employment for failing to report the potential conflict of interest. Id. ¶ 37. Perdue alleges that Rockydale failed to provide her with any of the procedural safeguards outlined in the company's employee handbook prior to her termination, and that the company treated her differently than "[m]ale employees who acted in direct conflict with the company's interests and who violated other company policies." Id. ¶ 68. For instance, although Perdue witnessed and reported conduct by the scale house employees that caused Rockydale to lose revenue, "no employee was terminated or disciplined for this actual conflict of interest." Id. ¶ 39.

At the time of Perdue's termination, "Rockydale informed her that her health insurance would end at midnight that night, and that she could not receive her 401(k) for which she [was] fully vested, until one year after her termination." Id. ¶ 37. Perdue subsequently requested a hardship distribution from her 401(k) plan. Id. ¶ 51. Rockydale denied the plaintiff's request and once again advised her that she would need to wait a year before withdrawing funds from the account. Id. ¶¶ 50–51.

4

Perdue was previously diagnosed with lupus, fibromyalgia, and arthritis. Id. ¶ 53. She alleges that "[t]hese conditions were exacerbated by the harassment and mistreatment she suffered during her tenure at Rockydale," and that she experienced "elevated stress, nausea, insomnia, and an upset stomach from the harassment." Id. On multiple occasions, Perdue sobbed in her office and experienced physical shaking that was so intense that she could not type at her desk. Id. Her doctor prescribed Cymbalta for depression and anxiety, and a muscle relaxant to help her sleep at night. Id. ¶ 54. Perdue also had to get knee injections every time she experienced stress-related lupus "flares." Id. Perdue alleges that she continues to experience similar physical and emotional problems "resulting from the harassment and unjustified termination of her employment by Rockydale." Id. ¶ 58.

## Procedural History

Following her termination, Perdue filed a timely charge of sexual discrimination and harassment with the Equal Employment Opportunity Commission ("EEOC"). Id. ¶ 4. At the time this action was filed, the EEOC charge had been pending for more than 180 days, but the agency had not yet issued a right-to-sue letter. Id. Perdue has since received a right-to-sue letter from the EEOC. See Notice of Right to Sue, Dkt. No. 13-1.

In Counts I and II of her complaint, Perdue asserts claims of sexual discrimination and harassment in violation of Title VII. In Count III, Perdue claims that Rockydale violated the Equal Pay Act. In Count IV, Perdue asserts a claim for breach of contract. In Count V, Perdue asserts a claim of intentional infliction of emotional distress.

Rockydale has moved to dismiss the complaint under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. The defendant's motion has been fully briefed and argued and is now ripe for disposition.

5

## Standards of Review

Rule 12(b)(1) of the Federal Rules of Civil Procedure permits a party to move for dismissal of an action for lack of subject matter jurisdiction. The plaintiff bears the burden of proving that subject matter jurisdiction exists. Evans v. B. F. Perkins Co., 166 F.3d 642, 647 (4th Cir. 1999). Dismissal for lack of subject matter jurisdiction is appropriate "if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." Id. (internal citation and quotation marks omitted). In deciding a motion to dismiss for lack of subject matter jurisdiction, the court may "regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." Id.

Rule 12(b)(6) permits a party to move for dismissal of a complaint for failure to state a claim upon which relief can be granted. When deciding a motion to dismiss under this rule, the court must accept as true all well-pleaded allegations and draw all reasonable factual inferences in the plaintiff's favor. Erickson v. Pardus, 551 U.S. 89, 94 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of [her] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citation and quotation marks omitted). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570); see also Jones v. Bock, 549 U.S. 199, 215 (2007) ("A complaint is subject to dismissal for failure to state a claim if the allegations, taken as true, show the plaintiff is not entitled to relief. If the allegations, for example, show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal . . . .").

6

## Discussion

### I. Motion to Dismiss under Rule 12(b)(1)

Rockydale has moved to dismiss the Title VII claims for lack of subject matter jurisdiction. In particular, Rockydale argues that Perdue failed to exhaust her administrative remedies prior to filing suit.

Title VII creates a federal cause of action for employment discrimination. Davis v. N.C. Dep't of Corr., 48 F.3d 134, 136–37 (4th Cir. 1995). "Before a federal court may assume jurisdiction over a claim under Title VII, however, a claimant must exhaust the administrative procedures enumerated in 42 U.S.C. § 2000e-5(b), which include an investigation of the complaint and a determination by the EEOC as to whether 'reasonable cause' exists to believe that the charge of discrimination is true." Id. at 137 Section 2000e-5(b) "requires that the EEOC decide whether the agency will bring the claim in federal court or whether the complainant will be issued a right-to-sue letter, which letter is essential to initiation of a private Title VII suit in federal court." Id. at 138 (citations omitted).

The United States Court of Appeals for the Fourth Circuit has "long held that receipt of, or at least entitlement to, a right-to-sue letter is a jurisdictional prerequisite that must be alleged in a plaintiff's complaint." Id. at 140 (emphasis added); see also Perdue v. Roy Stone Transfer Corp., 690 F.2d 1091, 1093 (4th Cir. 1982) ("It is entitlement to a 'right to sue' notice, rather than its actual issuance or receipt, which is a prerequisite to the jurisdiction of the federal courts under § 2000e-5(f)(1)."). "Under federal law, the EEOC has 180 days to process a claim and notify the complainant of the result." Burgh v. Borough Council of Montrose, 251 F.3d 465, 468 n.2 (3d Cir. 2001). Once the 180-day period expires, a complainant may request a right-to-sue letter from the EEOC, and the agency must "promptly issue" such letter. 29 C.F.R. § 1601.28(a)(1).

7

In this case, Perdue expressly alleged in her complaint that more than 180 days had passed since she filed her charge of discrimination with the EEOC. See Compl. ¶ 4. Consistent with the majority of district courts in the Fourth Circuit, the court concludes that the plaintiff was "entitled" to a right-to-sue letter at the time her complaint was filed, and that the court therefore has subject matter jurisdiction over her Title VII claims. See Barnes v. Shulkin, No. 1:16-cv-00940, 2018 U.S. Dist. LEXIS 9585, at *20 (M.D.N.C. Jan. 22, 2018) ("Barnes waited more than 180 days after filing his second EEOC complaint to file his complaint with this court, and the EEOC had not made a final decision on Barnes's complaint at that time. Thus, it appears as though Barnes exhausted his remedies and the issues presented in his second EEOC complaint are properly before this court."); Weathersbee v. Balt. City Fire Dep't, 970 F. Supp. 2d 418, 426 n.5 (D. Md. 2013) ("If the required time period [for issuing a right-to-sue letter] elapses, the jurisdictional prerequisites are satisfied, regardless of whether the EEOC actually issues a right-to-sue letter."); Veliaminov v. P.S. Bus. Parks, 857 F. Supp. 2d 589, 593 (E.D. Va. 2012) ("Here, Plaintiff had not heard from the EEOC in well over 180 days . . . . Plaintiff was entitled to a right-to-sue letter regarding his Title VII claims at the time he filed the Complaint in this Court. Thus, this Court has subject matter jurisdiction over Plaintiff's Title VII claims."); but see Gardner v. Md. Mass Transit Admin., No. 1:18-cv-00365, 2018 U.S. Dist. LEXIS 80511, at *13 (D. Md. May 14, 2018) (finding that "a better answer to when a plaintiff is 'entitled' to a right-to-sue letter is not when she 'could receive' the letter, but when she 'should receive' the letter," which "will vary from case to case").

Moreover, the record reflects that Perdue has since received a right-to-sue letter from the EEOC. Consequently, the court agrees with the plaintiff that the purported jurisdictional deficiency has been "cured." Veliaminov, 857 F. Supp. 2d at 594; see also Leuenberger v. Spicer, No. 5:15-cv-00036, 2016 U.S. Dist. LEXIS 10074, at *11 n.2 (W.D. Va. Jan. 28, 2016) (noting that the defendant's exhaustion argument was "moot because [the plaintiff] received a right-to-sue

8

letter just a few days after defendants filed their motions to dismiss"). Accordingly, Perdue's Title VII claims are not subject to dismissal under Rule 12(b)(1).

## II. Motion to Dismiss under Rule 12(b)(6)

Rockydale has moved to dismiss Counts III, IV, and V under Rule 12(b)(6) for failure to state a claim. The court will address each count in turn.

### A. Count III

In Count III of the complaint, Perdue asserts a claim under the Equal Pay Act. Perdue originally alleged that Rockydale discriminated against her "by paying lower compensation on the basis of sex for equal work" and by "refus[ing] to provide Perdue with a company truck in which to commute to and from work." Compl. ¶ 97. However, Perdue has since narrowed this claim. During oral argument, Perdue represented that the EPA claim is based solely on the fact that, unlike her male predecessor, the plaintiff never received a company truck to use for commuting purposes.

The EPA prohibits gender-based discrimination by employers resulting in unequal wages for equal work. 29 U.S.C. § 206(d)(1); see also U.S. Equal Emp't Opportunity Comm'n v. Md. Ins. Admin., 879 F.3d 114, 120 (4th Cir. 2018). "Under the EPA, the term 'wages' generally includes all payments made to . . . an employee as remuneration for employment." 29 C.F.R. § 1620.10. More specifically, the term "includes all forms of compensation," including "use of [a] company car," a "gasoline allowance," and other "[f]ringe benefits." Id.

Under the EPA, a plaintiff creates a presumption of discrimination when she establishes a prima facie case. Md. Ins. Admin., 879 F.3d at 120. A plaintiff establishes a prima facie case of discrimination "by demonstrating that (1) the defendant-employer paid different wages to an employee of the opposite sex (2) for equal work on jobs requiring equal skill, effort, and responsibility, which jobs (3) all are performed under similar working conditions." Id. Once a

9

plaintiff establishes a prima facie case, "the burdens of production and persuasion shift to the defendant-employer to show that the wage differential was justified by one of four affirmative defenses listed in the statute." Id. (emphasis in original). "These affirmative defenses are: (1) a seniority system; (2) a merit system; (3) a pay system based on quantity or quality of output; or (4) a disparity based on any other factor other than gender." Id. (citing 29 U.S.C. § 206(d)(1)).

The Supreme Court has explained that proof of a prima facie case is an "evidentiary standard, not a pleading requirement." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510 (2002). Accordingly, the plaintiff is not required to "plead facts establishing a prima facie case of discrimination to survive a motion to dismiss." McCleary-Evans v. Md. Dep't of Transp., 780 F.3d 582, 585 (4th Cir. 2005). However, the plaintiff is "nonetheless 'required to allege facts to satisfy the elements of a cause of action created by [the relevant] statute' in compliance with Iqbal.'" Woods v. City of Greensboro, 855 F.3d 639, 648 (4th Cir. 2017) (quoting McCleary-Evans, 780 F.3d at 585). Thus, the question at this stage of the proceedings is whether the plaintiff has stated a claim for relief under the EPA that is plausible, and not merely speculative. McCleary-Evans, 780 F.3d at 585–86.

Applying this standard, the court concludes that Perdue's complaint adequately states a claim of discrimination in violation of the EPA. Perdue was hired to replace Cooper Maxey as the scale house supervisor. See Compl. ¶¶ 5, 8. Perdue alleges that she and her male predecessor worked under similar conditions and that their jobs required equal skill, effort, and responsibilities. Id. ¶ 98. Nonetheless, they were not provided with the same benefits. Specifically, Perdue alleges that while "Maxey[] was provided with a company vehicle for commuting," Rockydale "refused to provide Perdue with a company truck in which to commute to and from work." Id. ¶ 97. While Rockydale may ultimately disprove these allegations or establish that the alleged

10

disparity was justified by a reason other than gender, the court concludes that the allegations are sufficient to withstand the defendant's motion to dismiss.

**B.    Count IV**

In Count IV of the complaint, Perdue asserts a claim for breach of contract. In particular, Perdue alleges that she and Rockydale "entered into a contract whereby, in exchange for her employment, Rockydale would . . . compensate Perdue, in part, by providing a company truck for commuting" and "with a $17,000 raise after 6 months of employment." Id. ¶ 106. Rockydale has moved to dismiss this count on multiple grounds. For the following reasons, the court concludes that Count IV is subject to dismissal.

First, to the extent Perdue alleges that the parties agreed in the offer letter that "she would have use of a company vehicle for business travel and her work commute," Compl. ¶ 8 (emphasis added), such allegation is belied by the document's plain terms. The offer letter specifically states that Rockydale "will provide [] use of a [company] vehicle, including gas, maintenance, and insurance, for business travel only." Offer Letter at 1.

Under Virginia law, which the parties agree applies in the instant case, the interpretation of a contract presents a question of law. Babcock & Wilcox Co. v. Areva NP, Inc., 788 S.E.2d 237, 243 (Va. 2016). "[T]he primary focus in considering disputed contractual language is for the court to determine the parties' intention, which should be ascertained, whenever possible, from the language the parties employed in the contract." Va. Elec. & Power Co. v. Norfolk S. Ry. Co., 683 S.E.2d 517, 525 (Va. 2009). "'Consequently, if such contractual language is unambiguous,' a court 'does not apply rules of construction or interpretation,' but 'simply give[s] the language its plain meaning.'" Va. Elec. & Power Co. v. Bransen Energy, Inc., 850 F.3d 645, 654 (4th Cir. 2017) (quoting Seoane v. Drug Emporium, Inc., 457 S.E.2d 93, 96 (Va. 1995)); see also Donnert v. Feld Entm't, Inc., No. 1:13-cv-00040, 2013 U.S. Dist. LEXIS 197934, at *9 (E.D. Va. June 14,

11

2013) (emphasizing that evidence of custom or usage cannot be used to alter the clear terms of a contract) (citing Walker v. Gateway Milling Co., 92 S.E. 826 (Va. 1917)). When determining the plain meaning of contractual terms, "the words used are given their usual, ordinary, and popular meaning." Pocahontas Mining LLC v. Jewel Ridge Coal Corp., 556 S.E.2d 769, 772 (Va. 2002).

Applying these principles, the court concludes that the term "business travel" is clearly distinct from, and does not include, commuting to and from work.[2] See, e.g., Bartolomucci v. Fed. Ins. Co., 770 S.E.2d 451, 456–58 (Va. 2015) (holding that "the ordinary meaning of 'business affairs' refers to a legal entity's income-producing activities" and that "[a] morning commute by a law firm partner from home to work does not constitute 'use[]' of the partner's vehicle 'in' a law firm's business . . . affairs"); Ross v. Bryan, 309 F.3d 830, 834 (4th Cir. 2002) (observing that "commuting or the mere act of traveling to work [is] not a natural incident of an employer's business" in Virginia) (internal quotation marks omitted); In re Phillips, 362 B.R. 284, 305 (Bankr. E.D. Va. 2007) (concluding that the use of an automobile for commuting purposes is "not a business use"); Business travel, WIKIPEDIA, https://en.wikipedia.org/wiki/Business_travel (last visited May 20, 2019) (defining "business travel" as "travel undertaken for work or business purposes, as opposed to other types of travel, such as for leisure purposes or regularly commuting between one's home and workplace"). Accordingly, Perdue has no viable claim for breach of contract based on the terms of the offer letter.

Perdue alternatively claims that Rockydale breached an alleged oral agreement by failing to provide her with a company vehicle for commuting purposes and by failing to give her a $17,000 raise after six months of employment. To the extent such claim is based on statements allegedly made in June of 2014, when the plaintiff was hired by Rockydale, the claim is clearly

---

[2] The plaintiff's own complaint distinguishes between these terms. See Compl. ¶ 8 ("Perdue's predecessor, Cooper Maxey, had use of a company truck for business travel and his work commute.") (emphasis added).

12

time-barred. In Virginia, a three-year statute of limitations applies to contract actions based on an oral contract. Va. Code § 8.01-246. The statute begins to run "when the breach of contract occurs." Va. Code § 8.01-230. "If the alleged breach is a single continuous breach, the limitations period runs from the inception of that breach, even when the breach continues for years." Fluor Fed. Solutions, LLC v. PAE Applied Techs., LLC, 728 F. App'x 200, 203 (4th Cir. 2018) (internal quotation marks omitted); see also Westminster Investing Corp. v. Lamps Unlimited, Inc., 379 S.E.2d 316, 318 (Va. 1989) (rejecting the contention that "a new cause of action" accrued every day the defendant breached a contract during a seven-year period); Hunter v. Custom Bus. Graphics, 635 F. Supp. 2d 420, 433 (E.D. Va. 2009) (explaining that the breach of contract occurred when the defendant stopped paying the plaintiff at the commission rate set forth in the employment agreement and that "each subsequent failure to pay did not constitute a new breach").

Applying these principles, it is clear from the complaint that Rockydale breached both of the alleged promises no later than January of 2015, when it failed to provide Perdue with "a company truck for commuting, and . . . a $17,000.00 raise after 6 months of employment." Compl. ¶ 106. Perdue did not file the instant action until August of 2018. Consequently, the court concludes that the statute of limitations bars any claim for breach of contract based on oral promises allegedly made at the time she was hired.

In an effort to avoid dismissal, Perdue argues that the alleged promises were repeated by Rockydale in August of 2016 and that her claim for breach of contract is also based on the more recent promises. See Pl.'s Br. in Opp'n 21, Dkt. No. 13. The problem with this argument is two-fold. First, the complaint does not make clear that Count IV is based on oral promises that were made in August of 2016. See Compl. ¶¶ 105–109. Second, the complaint is devoid of any allegations suggesting that Chris Willis, the "supervisor" who purportedly assured Perdue that she

13

would receive a raise and a truck for commuting purposes, Compl. ¶ 18, had actual or apparent authority to bind Rockydale to the alleged oral promises or otherwise modify the written terms of the plaintiff's employment. See Kern v. J.L. Barksdale Furniture Corp., 299 S.E.2d 365, 367 (Va. 1983) (discussing apparent authority); see also Offer Letter at 1 (agreeing to provide a company vehicle "for business travel only"); Employee Handbook at 14 (providing that "[a]ll pay increases for employees shall be in writing"). For these reasons, the court concludes that the complaint fails to plausibly allege that Rockydale owed Perdue any legally enforceable obligation based on the statements made in August of 2016. See Filak v. George, 594 S.E.2d 610, 614 (Va. 2004) ("The elements of a breach of contract action [include] (1) a legally enforceable obligation of a defendant to a plaintiff . . . ."). Consequently, Count IV is subject to dismissal.

### C. Count V

In Count V of the complaint, Perdue asserts a claim for intentional infliction of emotional distress ("IIED"). Such claims are disfavored in Virginia and require proof of the following elements by clear and convincing evidence: (1) that "the wrongdoer's conduct was intentional or reckless"; (2) that "the conduct was outrageous or intolerable"; (3) that "there was a causal connection between the wrongdoer's conduct and the resulting emotional distress"; and (4) that "the resulting emotional distress was severe." Supervalu, Inc. v. Johnson, 666 S.E.2d 335, 343 (Va. 2008). For the following reasons, the court concludes that the allegations in the complaint are insufficient to satisfy the second element.

To satisfy the second element and survive a motion to dismiss, it is "not enough" for a complaint to describe conduct that is "'insensitive and demeaning.'" Eldib v. Bass Pro Outdoor World, LLC, 654 F. App'x 620, 621 (4th Cir. 2016) (quoting Harris v. Kreutzer, 624 S.E.2d 24, 34 (Va. 2006). Instead, the conduct alleged in the complaint "must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as

14

atrocious, and utterly intolerable in a civilized community.'" Id. (quoting Harris, 624 S.E.2d at 33). In other words, "only the most execrable conduct can give rise to the tort." Webb v. Baxter Healthcare Corp., No. 94-1784, 1995 U.S. App. LEXIS 14534, at *17 (4th Cir. June 13, 1995).

"The Fourth Circuit has acknowledged that under some circumstances, 'sexual harassment may give rise to a claim for intentional infliction of emotional distress.'" Faulkner v. Dillon, 92 F. Supp. 3d 493, 501 (W.D. Va. 2015) (quoting Paroline v. Unisys Corp., 879 F.2d 100, 113 (4th Cir. 1989), vacated in part on other grounds, 900 F.2d 27 (4th Cir. 1990)). In Paroline, however, the Court concluded that the course of sexually suggestive comments and inappropriate touching described by the plaintiff was not sufficiently outrageous. 879 F.2d at 113. The Court found that the facts in the case before it were distinguishable from those in Swentek v. USAIR, Inc., 830 F.2d 552 (4th Cir. 1987), in which it had held that the alleged sexual harassment of a female flight attendant could support an IIED claim under Virginia law. Id. In Swentek, the plaintiff "alleged that for several years [the defendant] seized every opportunity to upset her with sexually abusive language and conduct," which included "repeated reference to her private parts," seeking her out to make "obscene comments," dropping his pants in the plaintiff's presence, and engaging his friends in "sexually molesting behavior." 840 F.2d at 562. Although "[t]he alleged harassment in Swentek could support a finding of 'outrageousness' under Virginia law," the Fourth Circuit concluded that the alleged harassment in Paroline "could not." Paroline, 89 F.2d at 113.

After reviewing the complaint, the parties' arguments, and applicable caselaw, the court concludes that the conduct described by the plaintiff does not rise to the level of outrageousness required under Virginia law. Unlike Faulkner, on which Perdue relies, the conduct described in the complaint does not include the "solicitation of sexual favors," "repeated and unwanted physical contact," "offers of money for sexual acts," and other recurrent "advances and solicitations" by a manager or supervisor. See Faulkner, 92 F. Supp. 3d at 501–02 (concluding

15

that allegations of such behavior were sufficient to survive a motion to dismiss). Instead, the complaint depicts the type of "[i]nsenstive and demeaning conduct" or "verbal[] abuse" that courts have held does not approach the level of extreme or outrageous conduct necessary to sustain a claim of intentional infliction of emotional distress.[3] Harris, 624 S.E.2d at 34; see also Webb, 1995 U.S. App. LEXIS 14534, at *18 (concluding that the plaintiff's allegations of gender-based ridicule and humiliation by her boss were insufficient to state a claim for intentional infliction of emotional distress); Dwyer v. Smith, 867 F.2d 184, 194–95 (4th Cir. 1989) (holding that sexual harassment by a squad leader, which included sexual comments, accusations of sexual relations with other officers, and the placement of pornographic materials in the plaintiff's work mailbox, was not sufficiently outrageous); Lindsey v. Ricoh USA, Inc., No. 2:17-cv-00464, 2018 U.S. Dist. LEXIS 69206, at *38 (E.D. Va. Apr. 24, 2018) (holding that a supervisor's frequent berating of the plaintiff "using expletives, misogynistic themes, and sexually debasing language" did not rise to the level of outrageous conduct required under Virginia law); Coles v. Carilion Clinic, 894 F. Supp. 2d 783, 786–87, 796 (W.D. Va. 2012) (holding that allegations surrounding the use of racially abusive language and symbols were insufficient to satisfy the second element of an emotional distress claim, where the plaintiff alleged that "he was frequently referred to by fellow employees as a 'nigger' and a drug dealer, subjected to the display of shackles and a noose in the workplace, subjected to references to the Ku Klux Klan and the lynching of a black man," advised by one manager "that he would never advance because he was a 'worthless nigger,'" and told by another manager "that he was a 'lazy nigger,' and that the manager desired to terminate [the plaintiff] but 'could not figure out how to do it'"); Shiflett v. GE Fanuc Automation Corp.,

---

[3] To the extent Count V is based on the defendant's failure to provide a company vehicle for commuting purposes, the termination of the plaintiff's health insurance benefits, or the defendant's refusal to permit immediate access to the plaintiff's 401(k) plan, the court concludes that such actions or omissions are not so extreme or outrageous that they support a claim for intentional infliction of emotional distress.

16

3:95-cv-00073, 1996 U.S. Dist. LEXIS 14306, at *9–10 (W.D. Va. July 23, 1996) (holding that harassing comments and other conduct that included falsely accusing the plaintiff of sexual harassment did not rise to the level of outrageousness required to withstand dismissal).

In short, the conduct described in the complaint, while "no doubt reprehensible," "unmannered," and "uncouth," does not meet the "extremely stringent standard" applicable to claims of intentional infliction of emotional distress. Id. For this reason, the court concludes that Count V fails to state a claim upon which relief can be granted.

## Conclusion

For the reasons stated, the defendants' motion to dismiss will be granted in part and denied in part. The Clerk is directed to send copies of this memorandum opinion and the accompanying order to all counsel of record.

DATED: This 22d day of May, 2019.

_____
Senior United States District Judge

17